1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11

GILDARDO RODRIGUEZ,

12

Petitioner,

13

v.

14

RICK HILL, Warden,

15

Respondent.

Civil No.      13-cv-1191 LAB (DHB)

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE REGARDING PETITION FOR WRIT OF HABEAS CORPUS**

16

17         Gildardo Rodriguez ("Petitioner" or "Rodriguez"), a state prisoner proceeding *pro*

18 *se*, filed a Petition for Writ of Habeas Corpus on May 17, 2013, pursuant to 28 U.S.C. §

19 2254.  (ECF No. 1.)  Petitioner seeks relief from his August 2010 conviction in San

20 Diego County Superior Court Case No. SCD199612 when a jury (1) found Petitioner

21 guilty of second degree murder, and (2) found true the allegation that Petitioner used a

22 deadly weapon during the commission of that offense.  (*Id.* at 1-2.)[1]  The trial court

23 sentenced Petitioner to a term of fifteen years to life, plus an additional one year for the

24 deadly weapon enhancement.  (*Id.* at 1.)  Respondent filed an Answer on July 29, 2013,

25 arguing that one of Petitioner's claims is procedurally defaulted and that both of

26

27         [1]  Page numbers for docketed materials cited in this Report and Recommendation
generally refer to those imprinted by the Court's electronic case filing ("ECF") system.
28 One exception to this general practice is the Courts citation directly to the lodged state
court record.

Petitioner's claims fail on the merits.  (ECF No. 7.)  Petitioner filed a Traverse[2] on October 9, 2013.  (ECF No. 11.)

After a thorough review of the pleadings and all supporting documents, the Court finds that Ground Two of the Petition is procedurally defaulted and that Grounds One and Two lack merit.  Accordingly, the Court **RECOMMENDS** that the Petition be **DENIED**.

# I. BACKGROUND

**A.  Factual Background**

The following facts are taken from the unpublished opinion of the California Court of Appeal in *People v. Rodriguez*, Case No. D058129 (Cal. Ct. App. Apr. 10, 2012). (Lodgment No. 7.)  The Court presumes these factual determinations are correct pursuant to 28 U.S.C. § 2254(e)(1). *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary.").  As the California Court of Appeal stated:

*Prosecution Evidence*

*Prior Domestic Violence Acts*

Emilia Gomez's mother, Alejandra Chavelas Garcia, testified Gomez started dating Rodriguez when Gomez was 13 years old.  They married when Gomez was 16 years old; they have three children together.  Garcia saw Gomez every day.  Gomez was not happy being married to Rodriguez because, after they married, he started hitting her.

Garcia saw Rodriguez hit Gomez approximately 10 times.  Once, when Garcia was at Gomez's home, she found Gomez on the floor with her blouse torn, a bruise on her face, a bloody nose, and a bump on her forehead.  She saw Rodriguez kick Gomez about four times.

On another occasion, eight years before the trial, Garcia saw Rodriguez kick Gomez five times and beat her with his fist and a belt. When Garcia tried to intervene, Rodriguez kicked Garcia in the stomach.

Sometimes when Gomez visited Garcia, Garcia saw bruises on Gomez's hands and face.  The abuse continued until Rodriguez left Mexico in 2000 for the United States.

---

[2]  Aside from including a lengthy section generally discussing federal habeas standards and substituting the word "Petitioner" for "appellant," the points and authorities portion of Petitioner's Traverse appears to be a duplicate of the points and authorities portion of his Petition, which itself consists of a copy of his petition for review to the California Supreme Court on direct appeal.

In December 2005 San Diego police officers responded to a domestic violence call at Rodriguez's apartment. Gomez was crying, scared, and nervous. She had reddening of the skin and bruising around her throat. Rodriguez had a minor cut on his left bicep and abrasions on his knee.

Rodriguez told the officers Gomez had been on the telephone with a man. Because she had cheated on him in the past, he demanded to know the caller's identity. Gomez ignored him and he slapped her. Based on Rodriguez's remarks and Gomez's injuries, one of the officers arrested Rodriguez as the primary aggressor.

Rodriguez subsequently told the arresting officer that Gomez had tried to leave after he confronted her about the phone call. He grabbed her and slapped her across the face. She hit him back. He then pushed her backwards onto the bed, jumped on top of her, and tried to calm her down by grabbing her around the neck. She grabbed a pencil and stabbed him in the left bicep and kicked him in the knee. She called 911 and he ripped the phone cord out of the wall because he was the man of the house and did not want any help with his family from the police.

One of Gomez's coworkers noticed Gomez was always sad. Gomez told the coworker she was afraid of Rodriguez because he abused her, although the coworker never saw bruises on Gomez or marks on her face. Gomez also told the coworker she was seeing another man and Rodriguez had said if Rodriguez could not have her, no one could. Rodriguez admitted making this statement to Gomez, but denied he meant it as threat or that he was thinking about killing Gomez at the time.

*Gomez's Stabbing*

Rodriguez came to the United States in 2000. He lived with his brothers Francisco Rodriguez (Francisco) and Jaime Rodriguez (Jaime)[.] Approximately two years later, Gomez joined him. She was pregnant with another man's baby. At first, Rodriguez was angry about the baby and told her he would not have brought her to the United States if he had known of her pregnancy. They talked about putting the baby up for adoption, but after she was born, Rodriguez grew to love her and they kept her.

While Rodriguez and Gomez lived with him, Francisco did not see them argue or fight. He did not see Francisco hit Gomez and he did not see any bruises on her. However, a neighbor and family friend who saw them frequently testified Rodriguez and Gomez had obvious relationship problems.

At some point before the 2005 domestic violence incident, Rodriguez began dating another woman and Gomez began dating a man named Carlos. Rodriguez knew about Gomez's relationship with Carlos and it angered him. Several times the phone would ring and no one would be on the other line. Then it would ring again, and Gomez would answer and have a conversation with the caller.

After the domestic violence incident in December 2005, Rodriguez was deported to Mexico and Gomez moved out of the apartment she had been sharing with Rodriguez and his brothers. She continued to date Carlos.

-3-

Rodriguez returned to the United States, moved back in with Francisco, and periodically saw Gomez. Francisco advised Rodriguez to be careful about continuing his relationship with Gomez as a tragedy could happen.

In mid-May 2006 Gomez rented a room in an apartment a block or two from Rodriguez's apartment. Rodriguez visited Gomez almost every evening. Gomez's landlord, Martha Flores Salgado, never saw Rodriguez spend the night. Salgado never saw Rodriguez fight with Gomez and Gomez appeared happy when Rodriguez visited her.

In the morning, on June 10, 2006, Rodriguez, Gomez, and Gomez's daughter returned to the apartment from an outing and went to Gomez's room. They all appeared happy. Later in the afternoon, Gomez was in her room with her daughter while Rodriguez was outside the house cutting a coconut with one of Salgado's kitchen knives. Salgado left the apartment around then. Salgado returned between 10:00 p.m. and 10:30 p.m. The light was on in Gomez's room, which was unusual. Salgado went to sleep and awoke at 3:00 a.m. The light was still on. Because the light was still on in the morning, Salgado asked one of her sons to open the door, reach into the room, and turn off the light. He told Salgado that Gomez was still lying down. Salgado thought this was unusual since Gomez was supposed to go to work, so she went inside Gomez's room. Gomez's daughter was missing and Gomez was completely wrapped in blankets. Salgado uncovered Gomez's face, touched her forehead, and concluded she was dead.

When a police officer arrived, the officer found Gomez's body in the corner of her room. Some of her blood was spattered on the walls near her body. She had cuts on her body and blood on her chest and arms. She was fully clothed, lying face up, and covered with a blanket. A large kitchen knife with her blood on it, the same knife Rodriguez had been using to cut the coconut, lay on the left side of her body.

There were photographs strewn outside in the front of the house. Some of the photographs were of Gomez, Rodriguez, and Gomez's daughter. One of the photographs was of two of Rodriguez and Gomez's children. There was a broken frame and additional torn photographs in Gomez's room. Rodriguez said he tore some of the photographs and Gomez tore others.

A deputy medical examiner determined Gomez died from multiple stab wounds. Autopsy results showed Gomez had a recent blunt force injury to her mouth. The injury was consistent with her being punched or with someone putting a hand over her mouth and pressing it shut so she could not make a noise. In addition, she had numerous knife wounds, most of which were in her abdomen and chest. The wounds were consistent with being caused by the knife found next to Gomez's body.

Approximately eight days after Garcia learned of Gomez's death, Rodriguez telephoned Garcia and told her he had killed Gomez by stabbing her. He also told her to pick up Gomez's daughter from Mexican authorities.

Approximately three years later, a Missouri jail notified the San Diego Police Department Rodriguez was in custody. Detectives traveled to Missouri to interview and extradite Rodriguez. During the interview,

Rodriguez initially claimed he was not involved in Gomez's murder. He subsequently admitted stabbing her.

Rodriguez said that about 10 days before he stabbed Gomez, he dropped Gomez off after returning from a casino and rested outside in the car for 10 to 15 minutes. While he was resting, he saw Gomez open her bedroom window for Carlos. Rodriguez stopped Carlos and the two men fought each other. Rodriguez told Carlos to leave Gomez alone because she and Rodriguez had children. Carlos told Rodriguez that Gomez did not love Rodriguez.

According to Rodriguez, on the day he killed her, Gomez belittled him and said "a lot of things that hurt [him]" before he stabbed her. She said Carlos was more of a man and she felt more sexually with Carlos than with him. She said Rodriguez was and would always be an idiot. She said she did not care about their children, she did not want to see him any more, and she did not want him to see her daughter again. She said she spent the money he sent to her in Mexico on the man who impregnated her. After she said these things, he started to gather his belongings, including some photographs he had brought over to persuade her to change her mind, but they kept arguing. She stood at the door and kept provoking him until he exploded.

He picked up the knife, which he saw when he was gathering his belongings, knelt down, and stabbed her about four times in the stomach as she was sitting on the floor. He denied stabbing any other area of her body. After he stabbed her, Gomez told him she was entrusting their children to him, but he did not believe her because she never loved them or had time for them. She rolled herself up in a blanket.

Afterwards Rodriguez left with Gomez's daughter, who had been playing in the room while the stabbing occurred, and went to Mexico.

*Defense Evidence*

Rodriguez and Gomez spoke with Rodriguez's brother, Jaime, on the phone around 2:30 p.m. the day of the stabbing. Rodriguez sounded normal, but Gomez sounded tired and agitated. Rodriguez called Jaime later that night and sounded desperate.

Gomez told Reina Barrios (Reina), with whom Gomez and Rodriguez briefly lived when Gomez first came to the United States, that her pregnancy was the result of a rape. Gomez also told Reina that Rodriguez was angry about the pregnancy. Reina told a police detective that sometimes Rodriguez would argue with Gomez and make her cry. Gomez's relationship with Carlos was common knowledge.

Ana Barrios (Ana) was Carlos's roommate. She saw Gomez visit Carlos twice and he told her he was dating Gomez. Ana knew Gomez was married to Rodriguez. She told Gomez not to visit anymore because she did not want any trouble.

Rodriguez testified he and Gomez met through their mothers, who were friends. He was four years older than Gomez and, at first, they were just friends. After they became romantically involved, Gomez became pregnant and they married. He initially testified their relationship was good

and they did not argue. On cross-examination, however, he admitted he and Gomez fought and he beat Gomez on a few occasions when they lived in Mexico, but he denied he ever left her with bruises.

According to Rodriguez, the argument Garcia witnessed occurred because Garcia told Gomez that Rodriguez was looking at another woman. He admitted yelling at and pushing Gomez. Garcia grabbed him by the hair and he pushed her to get her to release his hair. He denied the argument involved any kicking or punching. He also denied Garcia's assertion that he was always beating Gomez.

He admitted he and Gomez argued a couple of other times when they were living in Mexico. He denied the arguments became physical, although sometimes they would throw shoes and other items at one another. He denied ever previously threatening Gomez with a knife and did not remember ever bruising her or cutting her.

He came to the United States in 2000. He eventually found work and sent most of his earnings to Gomez believing she was saving the money. He missed Gomez and was very happy when she joined him in the United States. When he learned she was pregnant, he was angry and drank a lot of beer. He denied his anger prompted him to hit her. She told him she had been raped and they talked about giving the baby up for adoption. After the baby was born, Rodriguez came to love her and they decided to keep her.

As the baby grew older, Gomez started going out a lot and they started having problems with their relationship. He heard rumors of her having an affair. In addition, when the phone rang and he or one of his brothers answered it, there would be no one on the other line. But, when Gomez answered the phone, there would be someone on the line.

In December 2005 he received two of the phantom phone calls. When the phone rang a third time, he had Gomez answer the phone and someone was on the line. A few days earlier he had found a torn up love letter written by Gomez to Carlos. He became angry and demanded to speak to the person on the phone. She would not let him, they struggled, and he unplugged the phone. They started to argue, he pushed her toward the bed, and they started hitting one another. She grabbed a pencil and stabbed [him in] the arm. He hit her and grabbed her neck to "calm her down." The police came and arrested him, he pleaded guilty to criminal charges, and, after he served some jail time, he was deported. He returned to the United States and their apartment eight days later. She moved out a week later.

Nonetheless, they decided to continue their relationship. He visited her regularly, continued to financially support her, and continued to treat her daughter as his own. They started arguing again, but were occasionally intimate and Gomez never indicated she no longer wanted to see him.

At some point, he started dating another woman who lived near Gomez. Meanwhile, the rumors about Gomez's relationship with Carlos continued. The rumors bothered Rodriguez and he confronted her about them, but she denied the relationship.

A week or two before Rodriguez stabbed Gomez, he dropped her off after an outing and, even though he lived close by, he decided to rest in his car for five to 10 minutes. While he was resting, he saw Carlos walking

toward the apartment and Gomez's window opening. He started "thinking really bad thoughts and [his] blood [was] boiling." He got out of his car and approached Carlos. Carlos admitted he was dating Gomez and the two men got into a fistfight. Carlos knocked him down with a grocery cart and left.

The next day he went to see Carlos and told him to leave Gomez alone because they were married and had children. Carlos told Rodriguez that Gomez preferred him. Gomez's relationship with Carlos made Rodriguez angry.

Rodriguez had previously confronted Carlos at a liquor store. The two men yelled "strong words" at one another. Rodriguez told Carlos to stop bothering Gomez because Gomez was with him. Carlos denied he was seeing Gomez.

The evening before Rodriguez stabbed Gomez, he and Gomez went to a casino. She constantly received phone calls, but would not answer them in his presence, which made him suspicious. After the outing, they picked up Gomez's daughter and he dropped Gomez and her daughter off at Gomez's apartment. He went home, returned the next morning, and took Gomez's daughter on an outing.

He returned once, left with Gomez's daughter again, returned around noon, and started watching television with Gomez's daughter. Gomez appeared to want to talk about something, but did not know how to start. When she left the room, he went to look in her drawer for a cell phone he had seen a few days earlier, which he thought was a Father's Day gift for him. She came back into the room and asked him what he was doing. He told her he was looking for his gift and she told him it was not for him.

He then thought the gift was for Carlos and became angry. They started arguing. They argued about the phone and about him sending money to his sister to take care of their children living in Mexico. She told him she only cared about her baby daughter because, through her, she could obtain papers allowing her to stay in the United States, but she could not expect anything from their children living in Mexico. She also told him she had not been raped, which surprised and humiliated him. He then became very angry and slapped her. She tried to slap him back, but he blocked her.

The argument became more heated. He asked if she was seeing Carlos and she admitted she was. They continued arguing and pushed one another.

She told him about her relationship with Carlos and that she was spending the money Rodriguez gave her on Carlos. It appeared to Rodriguez that Carlos had told her to make a decision and she had done so. Rodriguez became very angry and hit her again. She laughed and mocked him.

Realizing he should leave, he told her he was going and started gathering his belongings. She blocked the door with her arms and kept mocking and humiliating him by talking about Carlos. She said Carlos was better than Rodriguez, he made her feel more of a woman than Rodriguez did, and she was more comfortable with him.

He pushed her aside and to her knees, but she got up and blocked the door again. She also grabbed his bag and held on to it. He threw the bag and they started arguing again. They continued to talk about her infidelity and he started crying. She was his first girlfriend and lover and her betrayal hurt him. He also felt guilty about leaving her in Mexico to come to the United States, thinking she might not have gotten pregnant if he had stayed there with her.

He reminded her of everything he had done for her. She responded with mock sympathy and called him stupid and an idiot. She told him she regretted having a relationship with him. All of her remarks hurt him. The last remark made his blood boil. On cross-examination, he admitted he wanted to be with Gomez and could not stand the thought of her being with another man.

He knelt down and she squatted. She kept repeating her remarks about liking Carlos better than him and told him he was "very stupid" because she and Carlos had been seeing each other for awhile. He told her to shut up. He had a weapon in his hand at that point, but he was scared about having it and threw it on the floor. He picked it up and threw it down a second time. Then, he started to collect his belongings again and told her he was leaving. He asked if this was the end of their relationship. She said it was as she had made a decision and picked Carlos.

He suggested they go back to Mexico and start over. She told him that she had found the man she always wanted to have. They started arguing strongly again and he went down on his knees again. She also knelt down and kept talking about Carlos, her sexual relationship with Carlos, and Carlos being more of a man than him. Then she told him to "get the hell out of [there]," to never come back again or see her daughter again, and to "[g]o fuck [his] sister " since she was the one taking care of their children.

At those words he became even angrier and his blood was boiling. He picked up the weapon for the third time. She asked him if he intended to kill her. When he did not respond, she grabbed his hand that was holding the weapon, put it to her stomach and mocked him, saying he was not man enough to do it. He started stabbing her to shut her up.

When it was over, he stayed next to her for 15 minutes crying and thinking about taking his own life. Then, he gathered some clothing for Gomez's daughter and some other things, including some photographs he and Gomez had torn during their argument. After standing outside the apartment for approximately another 15 minutes, he drove away with Gomez's daughter and returned to Mexico.

He and Gomez argued for about two hours before he killed her. While he felt defeated at times and thought about leaving, he told himself that he needed to stay and fight for her. In addition, she blocked the door at times, although he admitted she was much smaller than him and he could have easily moved her out of the way. At the conclusion of his testimony, when the prosecution asked whether the reason he killed Gomez was because he did not want anyone else to have her, he responded, "More than anything, her words were very hurtful to me."

(Lodgment No. 7 at 2-14.)

**B.      Procedural Background**

      **1.      Direct Appeal**

On August 10, 2010, a jury convicted Petitioner of second degree murder, in violation of California Penal Code § 187(a).  (Lodgment No. 1 at 249.)  The jury also found true the allegation that Petitioner personally used a knife to commit the murder, in violation of California Penal Code § 12022(b)(1).  (*Id.*)  The trial court sentenced Petitioner to a determinate term of one year in prison for the weapon use enhancement plus a consecutive indeterminate term of fifteen years to life for the second degree murder conviction.  (*Id.*)  Petitioner subsequently appealed.  (Lodgment No. 4.)

On April 10, 2012, in an unpublished opinion, the California Court of Appeal affirmed Petitioner's judgment in all respects.  (Lodgment No. 7.)

On May 4, 2012, Petitioner filed a petition for review in the California Supreme Court.  (Lodgment No. 8.)  On June 27, 2012, the California Supreme Court denied his petition for review without comment.  (Lodgment No. 9.)

      **2.      Collateral Review**

On May 17, 2013, Petitioner filed a federal habeas petition.  (ECF No. 1.) Petitioner argues: (1) the trial court committed prejudicial error when it failed to give a pinpoint instruction informing the jury that verbal taunts may form the basis for heat of passion voluntary manslaughter; and (2) the trial court committed prejudicial error when it failed to instruct the jury that the inference of guilt based on prior acts of domestic violence applied to the lesser offense of voluntary manslaughter as well as to murder. (*Id.* at 6, 27.)  On July 29, 2013, Respondent filed an Answer.  (ECF No. 7.)  On October 9, 2013, Petitioner filed a Traverse.  (ECF No. 11.)

**II. DISCUSSION**

**A.      Legal Standard for Federal Habeas Relief**

A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."

28 U.S.C. § 2254(a).  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") controls review of this habeas action.  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997).  Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by a state court unless that adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). The "'contrary to' and 'unreasonable application' clauses have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000)).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts.  *Id.* at 694 (citing *Williams*, 529 U.S. at 405-06).

A federal habeas court "may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Id.* (citing *Williams*, 529 U.S. at 407-08).  Additionally, the "unreasonable application" clause requires that the state court decision "be not only erroneous, but objectively unreasonable." *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (per curiam) (citing *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003); *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam); *Williams*, 529 U.S. at 409); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) ("The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. . . . The state court's application of clearly established law must be objectively unreasonable." (citing *Williams*, 529 U.S. at 409-20, 412)); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004) ("Extraordinarily deferential to the state courts, the 'unreasonable application' clause does not trigger habeas relief unless

the state court's analysis was 'objectively unreasonable.'" (quoting *Clark v. Murphy*, 331 F.3d 1062, 1067-68 (9th Cir. 2003))).  "This requires a showing of error greater than clear error."  *Medina*, 386 F.3d at 877 (citing *Clark*, 331 F.3d at 1068).

Federal habeas courts must defer to factual determinations made by the state courts, to which a statutory presumption of correctness attaches, and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Schriro v. Landrigan*, 550 U.S. 465, 473-74 (2007) ("AEDPA . . . requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" (quoting 28 U.S.C. § 2254(e)(1))).

To determine whether habeas relief is available under § 2254(d), the Court "looks through" any unexplained decisions to the last reasoned state court decision as the basis for its analysis.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, [federal habeas courts apply the presumption that] later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.").  If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court authority.  *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000), *overruled in part by Lockyer*, 538 U.S. at 75-76.

Moreover, federal habeas courts reviewing prisoners' claims under § 2254 "must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in" *Brecht v. Abrahamson*, 507 U.S. 619 (1993).  *Fry v. Pliler*, 551 U.S. 112, 121 (2007); *see also Baines v. Cambra*, 204 F.3d 964, 977 (9th Cir. 2000) (Ninth Circuit applies the *Brecht* harmless error standard "uniformly in all federal habeas corpus cases under § 2254").  Thus, even if constitutional error occurred, a federal habeas petitioner must still demonstrate prejudice, that is, that

1   the "error 'had substantial and injurious effect or influence in determining the jury's

2   verdict.'" *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776

3   (1946)).

4   **B.   Ground One: Denial of Modification of CALCRIM No. 570**

5         Petitioner argues, as he did before the California Court of Appeal, that when a

6   defendant's heat of passion defense is premised on verbal taunts, and where the

7   prosecution implies that words cannot form the basis of a heat of passion voluntary

8   manslaughter, the trial court must, on request, give a pinpoint instruction informing the

9   jury that verbal taunts may form the basis for heat of passion voluntary manslaughter.

10   (ECF No. 1 at 14.)

11         Petitioner contends that although he killed his wife, he was "provoked to this

12   action by her disparaging words and demeaning taunts." (*Id.* at 15.)  However, the

13   prosecutor implied during her opening statement and closing argument that words alone

14   are insufficient to provoke for purposes of permitting the jury to find Petitioner guilty of

15   involuntary manslaughter based on a heat of passion defense, as opposed to second

16   degree murder. (*Id.* at 16.) Petitioner's trial counsel requested that CALCRIM No. 570,

17   California's standard jury instruction on involuntary manslaughter based on heat of

18   passion, be modified to clarify that words themselves can, in appropriate circumstances,

19   suffice for the provocation required for an involuntary manslaughter finding. (*Id.*)  The

20   trial court denied the request, concluding that defense counsel was nevertheless permitted

21   to argue that words and verbal taunts are sufficient. (*Id.*)  Petitioner contends the trial

22   court's denial of the requested pinpoint instruction "lightened the prosecution's burden

23   of proof as to a significant element, as well as misled the jury as to the actual law

24   pertaining to voluntary manslaughter," and as a result, the ruling violated Petitioner's due

25   process rights under the Fifth and Fourteenth Amendments and his right to fair jury trial

26   under the Sixth Amendment. (*Id.* at 17.)

27         Respondent contends Petitioner's claim fails because the state court's ruling was

28   not contrary to or an unreasonable application of Supreme Court precedent, nor an

unreasonable determination of the facts presented.  Specifically, Respondent argues that "[b]ecause Rodriguez was permitted to present his [heat of passion] defense, and because the jury was permitted to fully consider the defense, the trial court's ruling did not infringe upon Rodriguez's due process rights," and therefore, the Court of Appeal's rejection of Petitioner's claim was not contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, nor was it an unreasonable determination of the facts.  (ECF No. 7-1 at 16:1-6.)

## 1.  Trial Court's Decision

In its April 10, 2012 decision, the California Court of Appeal summarized the trial court's decision on this issue as follows:

> Defense counsel requested the trial court modify the CALCRIM No. 570 voluntary manslaughter instruction to include a pinpoint instruction informing the jury, "Provocation may be based on a sudden and violent quarrel, verbal taunts by an unfaithful wife, and the infidelity of a lover." Defense counsel made the request because the prosecutor had stated in her opening statement that words had prompted Rodriguez to kill Gomez and defense counsel wanted the jury to be informed that words, in appropriate circumstances, could constitute sufficient provocation for voluntary manslaughter.

> The prosecutor objected to the pinpoint instruction, arguing the pattern instruction adequately instructed the jury on the applicable law. The trial court thought the references in the pinpoint instruction to "unfaithful wife" and "infidelity of a lover" were argumentative; however, the trial court considered whether to include an explanation that provocation could be verbal or physical.  The trial court ultimately decided not to modify CALCRIM No. 570.[3]

---

[3]  The trial court gave the jury the following instruction regarding voluntary manslaughter and heat of passion:

> A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion. [¶]  The defendant killed someone because of a sudden quarrel or in the heat of passion if:

> 1.   The defendant was provoked;

> 2.   As a result of provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;

> AND

-13-

(Lodgment No. 7 at 14-15.)

## 2.   California Court of Appeal's Analysis

The California Court of Appeal concluded the trial court (1) did not err in denying the modification of CALCRIM No. 570 and, (2) even if the trial court had erred in refusing the requested instruction, the error was harmless.

First, the Court of Appeal recognized that "[t]he companion CALCRIM No. 522 instruction[4] informed the jury that the weight and significance of any provocation was for

---

> 3.   The provocation would have caused a person of average disposition to act rashly and without deliberation, that is, from passion rather than from judgment.
>
> Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶]  In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it.  While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. [¶]  It is not enough that the defendant simply was provoked.  The defendant is not allowed to set up his own standard of conduct.  You must decide whether the defendant was provoked and whether the provocation was sufficient. [¶]  In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts would have reacted from passion rather than from judgment. [¶] [If enough time passed between the provocation and the killing for a person of average disposition to cool off and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.] [¶]  The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or in the heat of passion.  If the People have not met this burden, you must find the defendant not guilty of murder.

(Lodgment No. 1 at 138-39.)

[4] CALCRIM No. 522, as given to the jury, stated:

> Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter.  The weight and significance of the provocation, if any, are for you to decide.
>
> If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder.  Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.

the jury to decide." (*Id.* at 16-17.)   The Court of Appeal then concluded that a "reasonable jury would have understood from these instructions [*i.e.*, CALCRIM Nos. 522 and 570] that verbal conduct, in appropriate circumstances, could constitute sufficient provocation.  Consequently, any further instruction by the trial court on this point was unnecessary." (*Id.* at 17 (citing *People v. Clark*, 52 Cal. 4th 856, 974-75 (2011) (a trial court "may refuse a proposed instruction . . . when the point is covered in another instruction."); *People v. Canizalez*, 197 Cal. App. 4th 832, 856-57 (Cal. Ct. App. 2011) ("[W]here standard instructions fully and adequately advise the jury upon a particular issue, a pinpoint instruction on that point is properly refused.")).)

Further, the Court of Appeal concluded that even if it was error to refuse the pinpoint instruction, the error was harmless.  The Court of Appeal noted that defense counsel's closing argument fully presented the defense theory and there was nothing in the trial court's instructions that precluded the jury from finding Gomez's remarks to be sufficient provocation.  (Lodgment No. 7 at 17.)

Finally, the Court of Appeal noted that the trial court had instructed the jury that it must follow the law as explained by the court, even where the attorneys' comments conflict with the court's instructions.  The Court of Appeal concluded that the prosecutor's remarks during opening statement and closing argument[5] did not rebut the

---

(Lodgment No. 1 at 137.)

[5] The Court of Appeal described the prosecutor's remarks during her opening statement and closing argument as follows:

In her opening statement, the prosecutor remarked, "You might ask yourself why did the defendant do this?  Why did he brutally murder [Gomez] that day?  To put it simply: words."  A short time later, the prosecutor remarked, "That afternoon of the murder, [Rodriguez] and [Gomez] got into an argument about their relationship.  Words were exchanged, common words that are sometimes used during a break up or in a heated argument in a relationship.  To quote the defendant he said, 'It was just words that hurt me.  It's just words that got to me.' "  Near the conclusion of her opening statement, the prosecutor described Rodriguez's confession and remarked, "[Rodriguez] said, 'She said a lot of things to hurt me.  It was just words that hurt me.  It was just words that got to me.'  That was his explanation of why he killed [Gomez.]"  The prosecution concluded her opening statement by assuring the jury the evidence was going to prove

1   presumption that the jury followed the court's instructions, a presumption that the Court

2   of Appeal found to be "particularly strong in this case because the trial court instructed

3   the jury on the applicable law after counsel concluded closing argument." (*Id.* at 17-19.)

### 3.   Analysis

5       Challenges to jury instructions normally present issues of state law involving no

6   question cognizable on federal habeas review even where the instruction is incorrect

7   under state law. *See Estelle v. McGuire*, 502 U.S. 62, 71-73 (1991) (citing *Marshall v.*

8   *Lonberger*, 459 U.S. 422, 438, n.6 (1983) ("The Due Process Clause does not permit the

9   federal courts to engage in a finely tuned review of the wisdom of state evidentiary

10  rules."); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (federal habeas relief

---

12  beyond a reasonable doubt Rodriguez murdered Gomez and that the words
13  Gomez said to Rodriguez were "in no way sufficient provocation to kill
    her." Rodriguez does not contend the prosecutor's remarks amounted to
14  misconduct and, considered in context, the remarks properly reflected the
    prosecutor's expectation of what the evidence would show in this case.

15      In her closing argument, the prosecutor addressed Rodriguez's
16  testimony about Gomez's verbal taunts in two ways. The prosecutor argued
    the jury should not believe Rodriguez's testimony because his testimony
17  differed significantly from his post-arrest statements, he embellished upon
    the taunts as he testified, and it was unreasonable under the circumstances
18  to believe Gomez taunted him in the manner he described while he had a
    knife in his hand. In addition, after defense counsel argued Gomez's verbal
19  taunts were not sufficiently provoking because they contained shocking
    revelations and were particularly hurtful to someone from Rodriguez's
20  culture and background, the prosecutor argued, "Defense counsel says, well,
    this is—you got to take into consideration the psychology of a woman and
21  a man. And, you know, the fact that verbal taunts and infidelity, that
    equates [to] heat of passion. Can you imagine, I'm sure every one of us in
22  this courtroom knows someone who's gone through a messy divorce, an
    ugly breakup, if you yourself have not gone through it yourself. Can you
23  imagine if that was a justification, every time you got into a horrible divorce
    and you killed someone, oh, heat of passion. That's it. There would be
24  bodies everywhere." The prosecutor then rhetorically asked whether, even
    if Gomez had insulted Rodriguez to the point he became homicidally
25  enraged, "a person of average disposition, knowing the same facts, same
    situation, [would] act in that rage and kill?" Moreover, she argued the jury
26  should not consider Rodriguez a person of average disposition because of
    his domestic violence history. Again, Rodriguez does not contend the
27  prosecutor's remarks amounted to misconduct and they "fell within the
    'wide latitude' of advocates 'to make fair comment upon the evidence.' "
28  (*People v. Blacksher* (2011) 52 Cal.4th 769, 830.)

(Lodgment No. 7 at 17-18 n.3.)

-16-

"is not available when a petitioner merely alleges that something in the state proceedings was contrary to general notions of fairness or violated some federal procedural right unless the Constitution or other federal law specifically protects against the alleged unfairness or guarantees the procedural right in state courts.") (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982); *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984)); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983) ("Insofar as Gutierrez simply challenges the correctness of the state . . . jury instructions, he has alleged no deprivation of federal rights." (citing *Engle*, 456 U.S. at 120-21)).

However, an erroneous jury instruction can sometimes be found unconstitutional in and of itself.  For example, a jury instruction violates due process if it omits an element of the offense.  *Osborne v. Ohio*, 495 U.S. 103, 122-24 (1990) (citing *In re Winship*, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.")).  As a result, "[t]he Due Process Clause of the Fourteenth Amendment prohibits the States from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." *Francis v. Franklin*, 471 U.S. 307, 313 (1985) (citations omitted).  In addition, "[a]s a general proposition, a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988) (citations omitted).

Nevertheless, "[b]ecause federal habeas corpus relief does not lie for errors of state law . . . federal habeas review of a state court's application of a constitutionally narrowed aggravating circumstance is limited, at most, to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (citations omitted); *see also Cupp v. Naughten*, 414 U.S. 141, 146 (1973) ("Before a federal court may overturn a conviction resulting from a state trial in which this instruction was used,

it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment.").  "Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation.  The question is ''whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process.''"  *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (per curiam) (quoting *Estelle*, 502 U.S. at 72).  A challenged instruction must not be viewed in isolation; rather, it must be considered "in the context of the instructions as a whole and the trial record."  *Estelle*, 502 U.S. at 72 (citing *Cupp*, 414 U.S. at 147).

If a federal habeas court determines that the trial court erred in instructing the jury, it must also determine whether the error prejudiced the defendant.  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) ("The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal.").  If an instruction is ambiguous in light of the given instructions, the reviewing court must "inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution."  *Estelle*, 502 U.S. at 72 (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

In instances where the alleged error involves the failure to give an instruction, the petitioner's burden is "especially heavy" because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  *Henderson*, 431 U.S. at 151.  Moreover, even assuming that omission of a particular instruction was constitutionally erroneous, federal habeas relief is not available unless the error had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 619.  Federal habeas relief is not granted "merely because there is a 'reasonable possibility' that trial error contributed to the verdict," instead the habeas petitioner must establish that trial error resulted in "actual prejudice."  *Id.* at 637.

/ / /

At trial Petitioner admitted to killing Gomez, but claimed he was provoked in the heat of passion.  Petitioner claimed that Gomez's verbal taunts and admission that she was cheating on him provoked him into stabbing and killing her.  The jury, therefore, was tasked with determining whether the prosecution met its burden of proving beyond a reasonable doubt that Gomez did not sufficiently provoke Petitioner.  The Court's inquiry therefore focuses on whether, in light of the record as a whole, the trial court's refusal to include the requested pinpoint instruction that verbal taunts are sufficient to constitute provocation amounts to constitutional error, and if so, whether the refusal "had substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 619.

Initially, Petitioner makes no effort to identify Supreme Court precedent supporting his contention that the trial court's refusal violated his due process rights.  Moreover, the Court's review of the record demonstrates that the trial court's refusal to include the pinpoint instruction did not so infect the trial that the resulting conviction violates due process. *Estelle*, 502 U.S. at 62.

The defense argued that verbal taunts had prompted Petitioner to kill Gomez and that words could constitute sufficient provocation to reduce the crime from murder to involuntary manslaughter based on a heat of passion defense.  However, the standard instructions given to the jury, *see infra* notes 3-4, adequately addressed this theory and did not preclude the jury from finding Gomez's remarks to be sufficient provocation. The court instructed the jury that murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.  The instructions further defined a killing because of a sudden quarrel or in the heat of passion to include situations where: (1) the defendant was provoked; (2) the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and (3) the provocation must have been sufficient to have caused a person of average disposition to act rashly and without deliberation.  The instructions clarified that no specific type of provocation was required as long as the provocation was such that a

person of average disposition in the same situation knowing the same facts would have reacted from passion rather than judgment; however, slight or remote provocation is not sufficient.  The trial court also instructed the jury that the weight and significance of any provocation was for the jury to decide.  Therefore, nothing in the overall charge to the jury precluded the jury from finding that Gomez's remarks were sufficient provocation.

The Court is of the opinion that, upon consideration of the record as a whole, Petitioner has failed to demonstrate "'a reasonable likelihood that the jury applied the challenged instruction in a way' that violates the Constitution."  *Estelle*, 502 U.S. at 72 (quoting *Boyde*, 494 U.S. at 380).  Moreover, even if the trial court's refusal was erroneous, the Court concludes the error was harmless because it did not have a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 619.  As the Court of Appeal recognized, defense counsel fully presented the defense's provocation theory and nothing in the trial court's instructions precluded the jury from finding that Gomez's remarks were sufficient provocation.  Thus, any error did not result in "actual prejudice."  *Id.* at 637.

In conclusion, Petitioner identifies no specific constitutional deficiency in the jury instructions pertaining to his provocation defense recognized as such by any controlling United States Supreme Court authority.  Thus, it cannot be said that the California Court of Appeal's decision to uphold the trial court's refusal to give the requested pinpoint instruction "was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d).  Nor was the decision "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

Accordingly, the Court **RECOMMENDS** that Ground One of the Petition be **DENIED**.

/ / /

/ / /

## C.   Ground Two: Failure to Inform the Jury that the Permissible Inference Discussed in CALCRIM No. 852 Also Applied to Voluntary Manslaughter

Petitioner also contends the trial court committed prejudicial error, in violation of his Fifth Amendment right to due process and his Sixth Amendment right to a fair trial, when the trial court instructed the jury[6] that it could infer Petitioner was guilty of murder based on his prior acts of domestic violence but the trial court failed to instruct the jury that the inference could also be applied to the lesser offense of voluntary manslaughter. (ECF No. 1 at 27, 36-37.)  Specifically, Petitioner contends because the trial court only instructed the jury that the inference applied to the charge of murder, and not to the lesser included offense of voluntary manslaughter, the defense was prejudiced in light of the defense theory that Petitioner killed his wife in the heat of passion. (*Id.* at 28.)  Petitioner contends that fairness compels that "whenever an inference of guilt is offered the jury as a short-cut to conviction, that inference should be applied as even-handedly as possible and not merely in a manner most favorable to the prosecution." (*Id.* at 29.)  Stated differently, Petitioner contends, "to the degree it was appropriate to tell the jury they could infer from [his] past acts of domestic violence his guilt for murder, it should have been incumbent upon the court to instruct the jury that the inference applied to voluntary manslaughter as well." (*Id.* at 30.)  Petitioner concludes that the trial court's instruction violated his constitutional rights to due process and a fair trial because it effectively relieved the prosecution of proving each element of the second degree murder offense beyond a reasonable doubt. (*Id.* at 36-37.)

Respondent contends Petitioner's claim fails because it is procedurally defaulted based on the California Court of Appeal's finding that Petitioner had forfeited the claim

---

[6] CALCRIM No. 852, as given to the jury, states, in part:

If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit and did commit murder, as charged here.

(Lodgment No. 1 at 130.)

by failing to request a clarifying instruction at trial.  (ECF No. 7-1 at 17:16-18:2.)  In addition, Respondent contends that even if the claim is not procedurally barred, Petitioner is nevertheless not entitled to federal habeas relief because the Court of Appeal's finding on the merits of the claim that the proposed instruction was not correct as a matter of state law was not contrary to, or an unreasonable application of, clearly established Supreme Court authority, nor did it involve an unreasonable determination of the facts.  (*Id.* at 18:3-25.)

## 1.    Procedural Default

### a.    Applicable Law

"In a federal habeas action brought by a state prisoner, federal courts 'will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'"  *La Crosse v. Kernan*, 244 F.3d 702, 704 (9th Cir. 2001) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)); *see also Ylst*, 501 U.S. at 803 (citing *Murray v. Carrier*, 477 U.S. 478, 485-92 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 87-88 (1977)) ("When a state-law default prevents the state court from reaching the merits of a federal claim, that claim can ordinarily not be reviewed in federal court.").  "For the procedural default rule to apply, however, the application of the state procedural rule must provide 'an adequate and independent state law basis' on which the state court can deny relief."  *Park v. California*, 202 F.3d 1146, 1151 (9th Cir. 2000) (quoting *Coleman*, 501 U.S. at 729-30) (citing *Fields v. Calderon*, 125 F.3d 757, 760 (9th Cir. 1997)).

> If a petitioner procedurally defaults his federal claims in state court by operation of a state rule that is independent of federal law and adequate to support the judgment, federal habeas review of the claims is barred unless the prisoner can demonstrate either cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claims will result in a fundamental miscarriage of justice.

*Carter v. Giurbino*, 385 F.3d 1194, 1196-97 (9th Cir. 2004) (citing *Coleman*, 501 U.S. at 750); *see also Calderon v. U.S. District Court (Bean)*, 96 F.3d 1126, 1129 (9th Cir.

1996) [hereinafter *Bean*] (quoting *Coleman*, 501 U.S. at 729-30) ("The procedural default doctrine 'bars federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement.'").

"The Ninth Circuit has held that because procedural default is an affirmative defense, Respondent must first have 'adequately pled the existence of an independent and adequate state procedural ground.'" *Roberts v. Uribe*, No. 11cv2665-WQH (BLM), 2013 U.S. Dist. LEXIS 34992, *8 (S.D. Cal. Feb. 6, 2013) (quoting *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003)).

> Once the state has adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense, the burden to place that defense in issue shifts to the petitioner. The petitioner may satisfy this burden by asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule. Once having done so, however, the ultimate burden is the state's.
>
> Accordingly, because it is the State who seeks dismissal based on the procedural bar, it is the State who must bear the burden of demonstrating that the bar is applicable - in this case that the state procedural rule has been regularly and consistently applied in habeas actions.

*Bennett*, 322 F.3d at 586. "If the state meets this burden, federal review of the claim is foreclosed unless the petitioner can 'demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.'" *Roberts*, 2013 U.S. Dist. LEXIS 24992, at *9 (quoting *Coleman*, 501 U.S. at 750).

"A state ground is independent and adequate only if the last state court to which the petitioner presented the claim 'actually relied' on a state rule that was sufficient to justify the decision." *Carter*, 385 F.3d at 1197 (quoting *Valerio v. Dir. of Dep't of Prisons*, 306 F.3d 742, 773 (9th Cir. 2002) (en banc), *cert. denied*, 538 U.S. 994 (2003); *Koerner v. Grigas*, 328 F.3d 1039, 1049-50 (9th Cir. 2003)). "Where there has been one reasoned judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst*, 501 U.S. at 803; *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007) (en banc), *cert. denied*, 552 U.S.

1316 (2008).

b.   Analysis

Here, the California Court of Appeal concluded Petitioner had forfeited his claim that the trial court erred by failing to include voluntary manslaughter as an offense the jury could conclude Petitioner was likely to commit and did commit based on his prior acts of domestic violence.  The appellate court reasoned that "although [Petitioner had] objected to the trial court giving CALCRIM No. 852 at all, he never requested the trial court clarify or amplify the instruction after the court overruled his objection." (Lodgment No. 7 at 20.)   The Court of Appeal[7] "actually relied" on California's contemporaneous objection rule in finding the claim forfeited, citing *People v. Castaneda*, 51 Cal. 4th 1292, 1348 (2011), which states: "'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.'" (quoting *People v. Hudson*, 38 Cal. 4th 1002, 1011-1012 (2006)). (Lodgment No. 7 at 20.)   The threshold issue with respect to Ground Two of the Petition is whether the forfeiture rule in *Castenda* is an independent and adequate state law basis to support a finding of procedural default.

a.   *Independence*

"For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law." *La Crosse*, 244 F.3d at 704 (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989); *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)); *see also Morales v. Calderon*, 85 F.3d 1387, 1393 (9th Cir. 1996) ("Federal habeas review is not barred if the state decision 'fairly appears to rest primarily on federal law, or to be interwoven with the federal law.'" (quoting *Coleman*, 501 U.S. at 735)). "A state law

---

[7]  In denying Petitioner's direct appeal without comment (Lodgment No. 9), the California Supreme Court is presumed to have adopted the reasoning of the California Court of Appeal's opinion (Lodgment No. 7) as the last "reasoned judgment." *Ylst*, 501 U.S. at 803 ("Where there has been one reasoned judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.").

ground is so interwoven if 'the state has made application of the procedural bar depend on an antecedent ruling on federal law [such as] the determination of whether federal constitutional error has been committed.'"   *Park*, 202 F.3d at 1152 (quoting *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985)).   "'[U]nless the state court makes clear that it is resting its decision denying relief on an independent and adequate state ground, it is presumed that the state denial was based at least in part upon federal grounds, and the petitioner may seek relief in federal court.'" *Siripongs v. Calderon*, 35 F.3d 1308, 1317 (9th Cir. 1994); *see also Harris*, 489 U.S. at 265 (recognizing presumption that a state decision does not rest on independent and adequate state law basis unless the decision "clearly and expressly identifies a state procedural bar.").

As discussed above, the forfeiture rule in *Castenda* states that generally a party forfeits his right to appeal an allegedly erroneous jury instruction unless "the party has requested appropriate clarifying of amplifying language." 51 Cal. 4th at 1348 (citing *People v. Hudson*, 38 Cal. 4th at 1011-12). An exception to the rule is when "the trial court gives an instruction that is an incorrect statement of law." *Hudson*, 38 Cal. 4th at 1012 (citing *People v. Smithey*, 20 Cal. 4th 936, 976 n.7 (1999); *People v. Frazer*, 106 Cal. App. 4th 1105, 1116 n.5 (2003)).

The Ninth Circuit has recognized that California's contemporaneous objection rule is an independent and adequate state law basis to support the denial of a federal habeas petition on grounds of procedural default where there was a failure to object at trial. *E.g.*, *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004) (jury instruction claim procedurally barred for failure to object at trial); *Melendez v. Pliler*, 288 F.3d 1120, 1125 (9th Cir. 2002) (citing *Garrison v. McCarthy*, 653 F.2d 374, 377 (9th Cir. 1981)); *Vansickel v. White*, 166 F.3d 953, 957 (9th Cir. 1999); *Bonin v. Calderon*, 59 F.3d 815, 842-43 (9th Cir. 1995). Thus, California's contemporaneous objection rule, which the Court of Appeal relied on in finding Petitioner's Ground Two claim to be forfeited, is an independent state ground.

/ / /

1

### b.    Adequacy

2   For a state procedural rule to be adequate, "the state law ground for the decision

3   must be well-established and consistently applied." *Bennett*, 322 F.3d at 583 (citing

4   *Poland v. Stewart*, 169 F.3d 573, 577 (9th Cir. 1999)); *see also Bean*, 96 F.3d at 1129

5   ("For the procedural default doctrine to apply, 'a state rule must be clear, consistently

6   applied, and well-established at the time of the petitioner's purported default.'" (quoting

7   *Wells v. Maass*, 28 F.3d 1005, 1010 (9th Cir. 1994))).   Thus, federal courts must

8   "examine whether the state courts were regularly and consistently applying the relevant

9   procedural default rule 'at the time the claim should have been raised.'" *Fields*, 125 F.3d

10   at 760 (quoting *Calderon v. Hayes*, 103 F.3d 72, 75 (9th Cir. 1996) (per curiam), *cert.*

11   *denied*, 521 U.S. 1129 (1997)); *see also Poland*, 169 F.3d at 577 ("A state procedural rule

12   constitutes an adequate bar to federal court review if it was 'firmly established and

13   regularly followed' at the time it was applied by the state court." (quoting *Ford v.*

14   *Georgia*, 498 U.S. 411, 424 (1991))).

15   As stated above, the Ninth Circuit has held California's contemporaneous objection

16   rule to be an adequate state law basis to support a procedural default finding.  *See*, *e.g.*,

17   *Paulino*, 371 F.3d at 1092-93.  Thus, Respondent has met his initial burden of pleading

18   an adequate state procedural ground.

19   Accordingly, the burden shifts to Petitioner to come forward with "specific factual

20   allegations that demonstrate the inadequacy of the state procedure, including citation to

21   authority demonstrating inconsistent application of the rule." *Bennett*, 322 F.3d at 586.

22   However, Petitioner makes no attempt to satisfy his burden of showing that the forfeiture

23   rule stated in *Castaneda* is inconsistently applied.  *See Paulino*, 371 F.3d at 1093

24   (petitioner "nowhere argues that California's contemporary-objection rule is unclear,

25   inconsistently applied or not well-established, either as a general matter or as applied to

26   him." (citing *Melendez*, 288 F.3d at 1124).

27   Accordingly, the Court concludes that in denying Petitioner's direct appeal without

28   comment the California Supreme Court adopted the reasoning of the California Court of

Appeal, which based its denial of Petitioner's Ground Two claim on California's contemporaneous objection rule stated in *Castenda*. Thus, the California Supreme Court relied on an independent and adequate state law ground. It follows that Ground Two is procedurally defaulted unless Petitioner can demonstrate (1) cause for the default and resulting prejudice, or (2) that a failure to consider the merits of his claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

### c.    Cause

"'[C]ause' under the cause and prejudice test must be something *external* to the petitioner, something that cannot be fairly attributed to him." *Id.* at 753. In this case, Petitioner makes no attempt to show that an external factor prevented defense counsel from requesting a more specific instruction.

### d.    Prejudice

Not only is Petitioner unable to show cause for his procedural default of the claim in Ground Two, but he is also unable to demonstrate that the default resulted in prejudice. "Prejudice [sufficient to excuse procedurally barred claims] is actual harm resulting from the alleged error." *Vickers v. Stewart*, 144 F.3d 613, 617 (9th Cir. 1998) (citing *Magby v. Wawrzasqek*, 741 F.2d 240, 244 (9th Cir. 1984)). Here, Petitioner has failed to establish prejudice resulting from the state court's denial of his claim in Ground Two because, for the reasons stated in this Report and Recommendation, the claim lacks merit.

### e.    Fundamental Miscarriage of Justice

"To permit consideration of procedurally defaulted claims under the miscarriage of justice exception, a petitioner must show a constitutional violation probably resulted in the conviction of one who is actually innocent." *Protsman v. Pliler*, 318 F. Supp. 2d 1004, 1015 (S.D. Cal. 2003) (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). To satisfy the "actual innocence" standard, a petitioner must show that, in light of new evidence, it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *Murray*, 477 U.S. at 496. Here, Petitioner makes no effort to establish actual innocence, nor does it appear such an effort would ever succeed given

that Petitioner admits to having killed his wife.

*f.      Conclusion*

In conclusion, the Court **RECOMMENDS** that Ground Two of the Petition be **DENIED** as a consequence of Petitioner having procedurally defaulted on this claim.

**2.    Merits**[8]

Even assuming arguendo Petitioner's claim in Ground Two is not procedurally defaulted, the claim fails on its merits because Petitioner cannot demonstrate that the California Court of Appeal's decision on the merits of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(1)-(2).

a.     California Court of Appeal's Analysis

The Court of Appeal concluded that even if Petitioner had not forfeited the claim that the trial court erred by failing to include voluntary manslaughter as an offense the jury could conclude Petitioner was likely to commit and did commit based on his prior acts of domestic violence, the claim lacks merit under California state law.  (Lodgment No. 7 at 20-22.)  Initially, the Court of Appeal recognized that, in general, evidence of prior domestic violence is admissible in a California criminal action in which a defendant is accused of a crime involving domestic violence.  (*Id.* at 20 (citing CAL. EVID. CODE § 1109(a)).)[9]  Next, because murder is a domestic violence dispute under California law, "the evidence of [Petitioner's] prior acts of domestic violence was generally admissible

---

[8]  "A state court need not fear reaching the merits of a federal claim in an *alternative* holding.  By its very definition, the adequate and independent state ground doctrine required the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law." *Harris*, 489 U.S. at 264 n.10.

[9]  "The purpose behind section 1109 is to address the difficulties of proof in domestic violence prosecutions and the repetitive nature of domestic violence." *People v. Ogle*, 185 Cal. App. 4th 1138, 1145, n.3 (Cal. Ct. App. 2010).

under section 1109 as to the murder charge." (*Id.* at 21.)  However, the Court of Appeal noted, "[t]he parties ha[ve] not cited nor [had the court] located any cases discussing whether voluntary manslaughter under a heat of passion theory is a domestic violence offense as to which section 1109 evidence is admissible." (*Id.*)  The Court of Appeal declined to decide the matter because, even assuming it is, the court concluded, for the following reasons, the trial court was not required to include voluntary manslaughter in CALCRIM No. 852:

> First, nothing in the language of section 1109, the authorities interpreting it, or the other authorities Rodriguez relies upon requires a trial court to automatically instruct the jury the evidence admitted under this section applies to both charged and lesser included offenses.  Second, the prosecutor did not offer evidence of Rodriguez's prior acts of domestic violence to prove voluntary manslaughter.  She offered it, among other reasons, to disprove voluntary manslaughter.  Third, Rodriguez did not rely on the prior domestic violence evidence to show he acted in the heat of passion.  Instead, he vigorously challenged the veracity and import of the prior domestic violence evidence.  Finally, the prior domestic violence evidence did not tend to show Rodriguez acted in the heat of passion.  Consequently, at least in this case, instructing the jury the prior domestic violence acts applied to voluntary manslaughter would have potentially confused or misled the jury.

(*Id.* at 21-22.)

The Court of Appeal also rejected Petitioner's reliance on *People v. Flores*, 176 Cal. App. 4th 1171 (Cal. Ct. App. 2009), because although the trial court had included both voluntary and involuntary manslaughter along with murder as offenses the jury could conclude the defendant was likely to commit and did commit based on prior acts of domestic violence, whether the trial court had properly done so was not an issue on appeal in that case.  (Lodgment No. 7 at 22.)

### b.   Analysis

As previously discussed, insofar as Petitioner alleges an instructional error under state law, this claim provides no basis for federal habeas relief.  *Estelle*, 502 U.S. at 72; *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) ("[A] state court's interpretation of state law . . . binds a federal court sitting in federal habeas." (citing *Estelle*, 502 U.S. at 67-68; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975)); *Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("Outside of the capital context, we have never said that the possibility

of a jury misapplying state law gives rise to federal constitutional error. To the contrary, we have held that instructions that contain errors of state law may not form the basis for federal habeas relief." (citing *Estelle*, 502 U.S. 62)). The Court's inquiry focuses on "whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process." *Cupp*, 414 U.S. at 147.

Petitioner makes no effort to identify Supreme Court precedent supporting his contention that the trial court violated Petitioner's due process rights by instructing the jury concerning the permissible inference from Petitioner's prior acts of domestic violence. In fact, Petitioner apparently concedes that there is no Supreme Court authority that would justify affording federal habeas relief. (*See* ECF No. 1 at 29-30 (recognizing the issue is "one of first impression" and that Petitioner "has found no authority directly on point with the proposition he presents here").

Moreover, the Court's review of the record demonstrates that the trial court's instruction did not so infect the trial that the resulting conviction violates due process. *Estelle*, 502 U.S. at 62. When properly viewing the challenged instruction "in the context of the instructions as a whole and the trial record," *id.* at 72 (citing *Cupp*, 414 U.S. at 147), it is apparent that the trial court did not improperly relieve the prosecution of its burden of proving each element of the charged offense beyond a reasonable doubt. The trial court instructed the jury that (1) Petitioner was presumed innocent and that the prosecution was required to prove him guilty beyond a reasonable doubt (Lodgment No. 1 at 109); and (2) the prosecutor carried the burden of proving beyond a reasonable doubt that Petitioner did not kill his wife as a result of a sudden quarrel or in the heat of passion. (*Id.* at 139.)

Based on the foregoing analysis, it cannot be said that the California Court of Appeal's decision to uphold the trial court's failure to include voluntary manslaughter as an offense the jury could conclude Petitioner was likely to commit and did commit based on his prior acts of domestic violence "was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the

United States," or that it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).

Accordingly, the Court **RECOMMENDS** that Ground Two of Petitioner's Petition be **DENIED**.

## D.   <u>Evidentiary Hearing</u>

Petitioner requests an evidentiary hearing in his Traverse.  (ECF No. 11 at 12:21-22.)  Respondent opposes Petitioner's request for an evidentiary hearing.  (ECF No. 7 at 3:5-6.)

AEDPA prescribes the manner in which federal courts must approach the factual record and "substantially restricts the district court's discretion to grant an evidentiary hearing."  *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999); *see also Cullen v. Pinholster*, 131 S. Ct. 1388, 1400-01 (2011) ("Section 2254(e)(2) imposes a limitation on the discretion of federal habeas courts to take new evidence in an evidentiary hearing.") (citing *Schriro*, 550 U.S. at 473).  In determining whether an evidentiary hearing is warranted:

> a district court presented with a request for an evidentiary hearing . . . must determine whether a factual basis exists in the record to support the petitioner's claim.  If it does not, and an evidentiary hearing might be appropriate, the court's first task in determining whether to grant an evidentiary hearing is to ascertain whether the petitioner has "failed to develop the factual basis of a claim in State court."  If so, the court must deny a hearing unless the applicant establishes one of the two narrow exceptions set forth in section 2254(e)(2)(A) & (B).  If, on the other hand, the applicant has not "failed to develop" the facts in state court, the district court may proceed to consider whether a hearing is appropriate, or required under [*Townsend v. Sain*, 372 U.S. 293 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992)].

*Baja*, 187 F.3d at 1078 (citation omitted).

In *Townsend*, the Supreme Court concluded that a defendant is entitled to a federal evidentiary hearing on his factual allegations if:

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the

state trier of fact did not afford the habeas applicant a full and fair fact hearing.

372 U.S. at 313; *see also* 28 U.S.C. § 2254(e)(2).[10]

"[A] determination of a factual issue made by a State court shall be presumed to be correct," with the "applicant [having] the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Because a federal court may not independently review the merits of a state court decision without first applying the AEDPA standards, a federal court may not grant an evidentiary hearing without first determining whether the state court's decision was an unreasonable determination of the facts." *Earp v. Ornoski*, 431 F.3d 1158, 1166-67 (9th Cir. 2005) (citing *Lockyer*, 538 U.S. at 71); *see also Schriro*, 550 U.S. at 474 ("[A] federal court must take into account [the § 2254] standards in deciding whether an evidentiary hearing is appropriate."). "In practical effect, . . . this means that when the state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not required to hold an evidentiary hearing.'" *Cullen*, 131 S. Ct. at 1399 (quoting *Schriro*, 550 U.S. at 474). "[A]n evidentiary hearing is *not* required on issues that can be resolved by reference to the state court record." *Totten v. Merkle*, 137 F.3d 1172, 1176 (1998) (citing *Campbell v. Wood*, 18 F.3d 662, 679 (9th Cir. 1994) (en banc); *United States v.*

---

[10] 28 U.S.C. § 2254(e)(2) provides:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--

    (A) the claim relies on--

        (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

        (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

    (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Moore*, 921 F.2d 207, 211 (9th Cir. 1990); *United States v. Birtle*, 792 F.2d 846, 849 (9th Cir. 1986)).

"If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Cullen*, 131 S. Ct. at 1400. If a claim subject to § 2254(d)(1) does not satisfy that statutory requirement, "it is unnecessary to reach the question whether § 2254(e)(2) would permit a [federal] hearing on the claim." *Id.* at 1421 n.12 (quoting *Williams*, 529 U.S. at 444).

As demonstrated above, the state court record establishes that neither of Petitioner's claims warrant federal habeas relief. Because he does not satisfy the exacting AEDPA standards prerequisite to receiving an evidentiary hearing, his request should be **DENIED**.

### III.  CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to United States District Judge Larry A. Burns under 28 §636(b)(1) and Local Civil Rule 72.1(d) of the United States District Court for the Southern District of California. For all the foregoing reasons, **IT IS RECOMMENDED** that Petitioner's habeas Petition be **DENIED** in its entirety on the ground that the Petitioner's custody violates no federal right.

**IT IS FURTHER RECOMMENDED** the Court issue an Order (1) approving and adopting this Report and Recommendation, and (2) directing that judgment be entered denying the Petition.

**IT IS HEREBY ORDERED** no later than **August 8, 2014**, any party to this action may file written objections with the Court and serve a copy on all parties. The document shall be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** any Reply to the Objections shall be filed with the Court and served on all parties no later than ten (10) days from service of Petitioner's filed Objections. The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's Order. *See*

1  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153

2  (9th Cir. 1991).

3          **IT IS SO ORDERED.**

4  DATED:  July 7, 2014

5

6          DAVID H. BARTICK
        United States Magistrate Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28